# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

OMAR RICHARD DEEN,
Defendant and Appellant.

S092615

Imperial County Superior Court
CF-5338

April 6, 2026

Acting Chief Justice Corrigan authored the opinion of the Court, in which Justices Liu, Kruger, Groban, Evans, Weingart,* and Rubin** concurred.

Justice Groban filed a concurring opinion, in which Justices Liu and Evans concurred.

_____

\* Associate Justice of the Court of Appeal, Second Appellate District, Division One, assigned pursuant to article VI, section 6 of the California Constitution.

\*\* Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. DEEN

S092615


Opinion of the Court by Corrigan, J.


Omar Richard Deen was convicted of the murder of his mother, Rachel Deen, and of Police Chief J. Leonard Speer, using a firearm. The jury found true special circumstance allegations that the murder of Ms. Deen was committed for financial gain and that of Chief Speer during the performance of his official duties.[1] It set the penalty at death, and that judgment was entered. The trial proceeded in four phases: competency, guilt, sanity, and penalty. The first phase, which resulted in a finding of competency, was heard by a separate jury and before a different judge from the phases that followed. We conclude that the court committed reversible error in ruling on a defense challenge of a panelist for cause. As a result, the judgment in its entirety is reversed and the matter remanded for further proceedings.[2]

## I. FACTUAL BACKGROUND

This summary is based on the evidence presented at the post-competency phases and limited to the context needed to evaluate the challenge for cause question. It is undisputed on

---

[1] See Penal Code section 187, subdivision (a), former sections 189, 12022.53, subdivision (d).

[2] Defendant has raised a number of challenges involving all four trial phases. In light of our holding, we need not address the majority of them and express no view as to those unaddressed assertions.

appeal that, on the afternoon of April 10, 1998, defendant killed his mother, Rachel Deen (Rachel), and Chief Speer at Rachel's equipment yard in Calipatria. He fled to Mexico, was apprehended that same day, and confessed.

## A. Guilt Phase

### 1. *Prosecution Guilt Phase Evidence*

Defendant's father died in 1995, leaving his wife an estate worth a minimum of several hundred thousand dollars. Upon Rachel's death, the estate was to pass to the couple's children, with defendant receiving the largest share.

On March 28, 1998, Rachel and her brother Ruben Dozal went to the Calipatria equipment yard. Defendant emerged from a room on the property where he lived, began yelling at them, and asked why Dozal was there. After a brief physical skirmish, Rachel and Dozal drove to the police station where Rachel reported the incident.

After Rachel's report, Officer James Belcher went to the yard and arrested defendant who unsuccessfully tried to "head butt" Belcher and bite him in the face. During booking, defendant threatened Belcher, saying: "[Y]ou better watch out for your family," and "I know where you live."

On April 2, Dozal and defendant spoke by phone. Defendant asked why Dozal was "going between" him and his mother. When Dozal did not respond, defendant said: "Don't worry about it because I already have a funeral home and cemetery picked out for her. . . . So don't worry about it." He then hung up. After the call, Rachel's attorney obtained a temporary restraining order (TRO) directing defendant to stay 100 yards away from the equipment yard. Defendant was seen

driving around town in a tractor that may have been taken from the yard.

On April 8, defendant visited Mario Magallanes in his auto repair shop, which was housed in a building Rachel owned. Using the shop phone, defendant spoke with his mother. Defendant was upset after the call and said "[H]e was going to execute his mother." Magallanes asked, "Why would you want to do something like that?" Defendant replied: "I just have to do this. I am fed up with all this." Defendant then offered to sell Magallanes the building in which his shop was located noting, "Well, look at it this way, I can even sell you the business really cheap." Magallanes said, "[W]hatever your plans are, don't include me in 'em." When defendant left, Magallanes called Rachel. The next day a motel room for defendant was booked for four nights on Rachel's credit card.

The murders happened on a Friday. Because Rachel's counsel had difficulty serving defendant with the temporary restraining order, Chief Speer had agreed to help effect service. The following Monday was the date set for the restraining order hearing.

Frank Mendez lived across the street from the yard. From his property, Mendez and his daughter Elizabeth saw the murders take place. Chief Speer was in uniform, talking to Rachel. Defendant arrived at the yard on foot and argued with the pair for about five minutes. Defendant yelled that he would not leave his room until Rachel provided him with a "30-day notice." His room was located behind a metal fence with an iron gate. Defendant went through the gate, closing it behind him.

Chief Speer approached the gate and appeared to speak through it for several minutes. He stood about two feet away from defendant and held nothing in his hands. When Speer

raised his hands with his palms up, defendant opened the gate and punched Speer repeatedly in the face. Speer held his hands at his sides during the attack. When Speer fell to the ground, defendant straddled him and continued punching him in the face. Again, Speer's hands remained at his sides. Rachel unsuccessfully tried to pull defendant away but fell to the ground. Defendant stood up holding Speer's gun. Using both hands with his arms extended, defendant shot Rachel twice then turned and shot Speer once. After the shooting defendant fled in Rachel's pickup truck, which had been parked in the yard.

Chief Speer called 911 at about 2:00 p.m., and reported he was "down." He identified "Omar Deen" as a suspect and said he was on foot. The Chief's wife, Evelyn Speer, also worked for the Calipatria Police department. She went to the yard and was soon joined by another officer. Chief Speer was in his car, conscious but barely able to speak. His Glock handgun was found on the ground. In his car, there was a police form used to document stolen vehicles that had been signed by Rachel at 1:30 p.m. that day.

Later that day, defendant was apprehended in Mexico and interviewed by Mexicali Police Officer Jose Juan Hirales. Defendant recounted that he had argued with his mother and the police had arrived. An officer placed his hand on defendant's back and told him to "leave the scene." Defendant said he punched the officer in the face knocking him to the ground. He then sat on the officer's stomach and continued to hit him in the face. When defendant's mother grabbed him and asked him to let the officer go, he knocked her to the ground as well. Defendant grabbed the officer's weapon, shot him twice, then shot his mother once. He said he "grabbed a pickup truck," knew

4

he "was involved in a lot of problems," and thought he could cross the Mexican border.

### 2. *Defense Guilt Phase Evidence*

Several days before the murders defendant had come with a friend to a behavioral health clinic. He had a "mask-like expression," appeared unresponsive to his surroundings, and did not make eye contact. The clinic's records did not reflect that he was professionally assessed.

Nine months after the killings, while in custody awaiting trial, defendant became agitated when he was handcuffed before being taken to another cell. When they arrived at the cell, and the transporting officer unsnapped keys from his belt, defendant yelled, "Go ahead and shoot me, go ahead and kill me."

Dr. Kirsten Fleming, Chief of Neuropsychology at UC Irvine, testified that defendant's IQ testing yielded a score of 86. Dr. Fleming diagnosed him as manifesting a severe thought disorder with frontal lobe dysfunction, which would diminish his impulse control, affect his judgment and planning capacity, and impair his ability to consider the consequences of his actions. She concluded he was functioning at a severely impaired level that could fairly be described as brain damage. She agreed on cross-examination that those with frontal lobe dysfunction are capable of planning, albeit poorly.

Psychiatrist Clark Smith diagnosed defendant with childhood-onset paranoid schizophrenia with psychotic delusions, brain damage and a history of methamphetamine abuse. People who knew him reported that defendant spoke in a bizarre fashion and appeared delusional, which Smith believed reflected a thought disorder. Neither Smith, nor any other evaluator whose notes he had reviewed, concluded defendant was malingering. Dr. Smith related that those with

schizophrenia are often unable to plan very well and that defendant's conditions would severely impair his ability to weigh considerations regarding a course of action. The unexpected and forcible removal from a residence would cause intense stress for such a person. Schizophrenia also affects a person's perception. Normal social behavior, such as offering to shake hands, might make a schizophrenic feel attacked.

Officer Hirales, the officer who spoke with defendant in Mexico on the day of the murders, described him as acting calmly "like nothing had happened." (See *ante*, p. 4.) Defendant related that the shooting had occurred in front of his residence and that he drove around Imperial County hoping to be killed by police officers. About an hour after leaving the scene, he realized he could escape to Mexico.

### 3. *Prosecution Guilt Phase Rebuttal*

Rachel's sister testified about defendant's long-standing verbal abuse of his mother and arguments about the disposition of his father's estate.

Psychiatrist Dr. Alan Abrams, chief psychiatrist at Centinela State Prison and an attorney, recounted defendant's admitted use of methamphetamine, heroin, LSD, PCP, cocaine, marijuana, and alcohol. Methamphetamine usage can cause hallucinations, delusions, and brain damage. Abrams diagnosed defendant with polysubstance abuse, methamphetamine dependence, and methamphetamine-induced psychosis. Defendant also had a "mixed personality disorder with antisocial and narcissistic features." Abrams disputed Dr. Smith's testimony as to childhood-onset schizophrenia, and delusions about law enforcement, attributing some of defendant's reported symptoms to his substance abuse. Abrams asserted that defendant had given

6

inconsistent or untruthful responses during interviews and admitted to another expert that he was "just making things up." In his opinion, defendant "is deceitfully reporting facts about himself and . . . deceitfully reporting symptoms," but defendant was "also a troubled guy who's used way too much methamphetamine."

## B. Penalty Phase Prosecution Evidence

The prosecution relied on the circumstances of the charged crimes and victim impact testimony. The Speers' daughter testified that her parents were high school sweethearts, had been married for 45 years, and were inseparable. They had worked together at the Calipatria Police Department for 10 years. After Chief Speer died, his wife Evelyn was lost and broken without him. Five months after the murder, Evelyn suffered a stroke and, at the time of trial, was still too ill to be left alone.

## II. DISCUSSION

Defendant asserts that the trial court erroneously denied several of his motions to excuse a potential juror for cause. One of those challenges has merit. In light of that conclusion, it is unnecessary to address his other claims of error.

## A. The Record Regarding Jury Selection

At the time of the April 2000 voir dire, "the jury selection provisions of Proposition 115, codified in Code of Civil Procedure former section 223, applied to this case. (Code Civ. Proc., former § 223, added by Prop. 115, as approved by voters, Primary Elec. (June 5, 1990); *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 299−300 . . . .)" (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 608.) That statute directed in relevant part: "In a criminal case, the court shall conduct the examination of prospective

jurors. However, the court may permit the parties, upon a showing of good cause, to supplement the examination by such further inquiry as it deems proper or shall itself submit to the prospective jurors upon such a showing, such additional questions by the parties as it deems proper. . . . [¶] Examination of prospective jurors shall be conducted only in aid of the exercise of challenges for cause." (Code Civ. Proc., former § 223.) The trial court here properly assumed primary responsibility for questioning prospective jurors. (*Beck and Cruz*, at p. 608.)

After hardship excusals, 101 panelists completed juror questionnaires. Thereafter, the selection process proceeded as follows. Twenty-four names were drawn, with 12 taking the jury box and the remaining panelists sitting in the "12-pack" of extra panelists. After all 24 panelists were questioned, the court took challenges for cause as to any of that two dozen. If a panelist in the jury box was excused for cause, that person was replaced in order by a panelist from the 12-pack. Peremptory challenges were then directed to those panelists in the box, with each excused panelist again replaced in order with a panelist from the 12-pack. Once the 12-pack was exhausted, a new 12-pack was drawn and questioned, followed by for-cause, then by peremptory, challenges. The process was repeated until 12 jurors had been accepted by both parties.

The panelist who was ultimately seated as Juror No. 5 is the subject of the challenge at issue and was questioned relatively late in the process. By the time he was seated in the

jury box the defense had exhausted its allotted peremptory challenges.[3]

Juror No. 5 was 60 years old at the time of trial and had worked for the El Centro Police Department from 1984 to 1997 as a "non-sworn I.D. tech[nician]." He retired from the El Centro department several months before the murders.[4] In questionnaire responses Juror No. 5 agreed that he was able to "follow the law as given to you by the judge, even if you disagree with the law." He had heard about the case from the "[p]olice" but checked a box marked "[y]es," when asked if he could "set aside what [he had] heard and decide the case based only upon the evidence presented in court." However, he also wrote, "Yes," when asked if he would have "any difficulty keeping an open mind until" he had heard all the evidence, arguments of counsel, and instructions. And he answered "Yes" when asked if the accusation of "killing a police officer" would prevent him "from being a fair and impartial juror in this case," writing that he had "known Chief Speer for [a] number of y[ea]rs . . . along w[ith] business dealings while w[ith] El Centro Police dept." He wrote he attended the funeral for Chief Speer but added he "had to leave."

During individual voir dire the court asked, "[I]s there anything about your [El Centro Police Department] experience . . . that would make it difficult for you to be fair and impartial in a criminal case?" The juror replied, "I would like to

---

[3] In total, the prosecution exercised 18 peremptory challenges and the defense 20.

[4] El Centro is a larger community, located about 30 miles south of Calipatria, where Speer was the police chief.

think not, but of course being in law enforcement, entrenched in it for 15 years might be a little difficult."

The court asked Juror No. 5 to expound on what he had heard about the case from the "[p]olice." He said, "I was going that particular day and came across — I was told by an officer, 'This is what's happened concerning Chief Speer,' and that's where I first heard about it." The court asked, "Were you requested or required —" He replied, "No, I was not involved in it at all." The court asked, "Anything you heard from the police or anywhere else . . . would you be able to set that aside and decide the case solely on the evidence in court?" The juror said, "Yes, I could do that."

The court asked about criminal cases he had followed in the news, and Juror No. 5 said: "Yes, I followed it through the newspaper, and then talking to some of the witnesses on . . . here [who were] there . . . . I did hear about it that way." He added, "So in detail — you're asking details? Yes, I knew details." He confirmed he could "wait until the end of the case . . . until both sides had presented their case and argued the case" before making up his mind.

The court asked Juror No. 5 more about his written responses. It noted the juror's answer that because defendant was accused of killing Chief Speer it "might give you some difficulty," and that the juror had "indicated that [he] had known Chief Speer for a number of years." It asked: "You've had some business dealings with him . . . while you were at the El Centro Police Department," and added, "Business dealings out of police work?"

Juror No. 5 replied, "Business outside originally," confirming that the dealings involved real estate. He added, "And then I would see Chief Speer occasionally when he came to

the department. We would go out for coffee, et cetera," and "going back a few years, I campaigned for him when he ran for Sheriff, and so we were — in that sense, a friendship existed." The court asked, "Was your relationship with Chief Speer such that you do not feel that you could be a fair and impartial juror in a case where someone is accused of murdering him?" The juror replied, "I could. I could." The court asked, "You could?" Juror No. 5 replied, "Sure."

The court said, "[Y]ou indicated that you went to Chief Speer's funeral?" The juror said, "And left. Had to leave." The court asked, "Were you able to make it into the church . . ." The juror replied, "No, I got called in just as I was approaching," adding "I didn't go, but the intentions were there."

The court subsequently turned to the list of anticipated witnesses, asking Juror No. 5 to identify anyone on the list whom he knew and explain how he knew them. Juror No. 5 said, "[A]ll of the El Centro police officers that are listed," and, at the court's direction, identified 14 individuals he recognized on the list. The court asked: "Any persons that you've listed, because of your past dealings with them or knowledge of their reputation, anything like that, [whom] you would not be able to weigh their testimony fairly and impartially in the manner that you would any other witness testifying on the same subject?" Juror No. 5 replied: "No. Just because they are police officers, no." The court asked again about comparing their testimony with "another witness testifying on the same subject," and Juror No. 5 said, "No, I wouldn't." The court asked, "Think you could weigh their testimony fairly and impartially?" Juror No. 5 said, "Sure." Juror No. 5 then left the courtroom.

The court asked, "Anything from the defense as to" Juror No. 5? Counsel requested the court inquire whether the panelist

"has had any dealings or contacts with Evelyn Speer since the incident" and "specifically ask what his relationship and dealings with her was," and "[w]hether or not he would be able to set aside . . . those contacts, and be as fair and impartial as the other jurors . . . who didn't have such information." Counsel added, "I think we're in dangerous waters when we have a gentleman [who] expresses some difficulty, obviously wants to be fair, has details of the offense from witnesses . . . It's possible Ms. Speer may come in here in the penalty phase asking to put our client to death." The court said it had heard she had suffered a "debilitating stroke," and the prosecutor said that she would not appear, did not speak, and there would be testimony tying the stroke to her husband's murder. Defense counsel argued that in the event Ms. Speer did not testify, Juror No. 5 "might have knowledge about her stroke[] that if it doesn't come in might be relevant and could affect the jury. What we're talking about, he's got law enforcement information, what happens if evidence doesn't come in at trial in other areas, . . . he has knowledge of certain things? . . . [¶] . . . [W]e're asking him to set aside certain things. He followed the case closely. He talked to witnesses, he talked to officers. He's . . . had business dealings with Mr. Speer. He knows Mrs. Speer." The court said it would "inquire further into [Juror No. 5's] relationship with Mrs. Speer. He indicated some real estate dealings. I don't know if that went on for any time after Mr. Speer's demise. If it did, he may have had dealings with her."

Juror No. 5 returned to the courtroom. The court asked, "[D]id you have any contact with [Evelyn Speer] after the incident that we're dealing with?" Juror No. 5 replied, "No, I did not." When asked to describe his relationship with her, Juror No. 5 said: "Just acquaintance. I didn't associate with her

socially or anything like that, just knew her and seen her with Chief Speer." The court asked if he knew Chief or Evelyn Speer better, and Juror No. 5 said, "Chief Speer." The court asked if he would have any difficulty "being fair and impartial in a case where Evelyn Speer is peripherally involved," and Juror No. 5 replied, "No." The court asked, "Did you have any of those real estate transactions with her" and Juror No. 5 replied: "No, it was with him, and it was just looking at a house. No purchase made." The court asked, "You didn't buy the house?" Juror No. 5 replied: "No, didn't buy the house, oh no." Juror No. 5 then left the courtroom again.

The court noted defense counsel had referred to a panelist having some knowledge of the case from police sources and the media. The court observed that in cases like the Oklahoma City bombing every person in the country would have followed it. It went on: "It seems to me that the answer is the rule, is the same in all of the cases. It doesn't matter if the jurors heard about it, the question is, can they set it aside?" Defense Counsel Beaudikofer said, "We can find lots of jurors who haven't had contacts with the victim, special information from witnesses in the case. That's different than the media." He referred to an example the court had previously offered during voir dire in which it followed the strict notice requirements in a landlord tenant dispute and denied relief to a property owner who had wanted to evict her tenant. Defense Counsel Beaudikofer noted that in that circumstance the court had not had any choice. "When you are putting up a juror in a case where he has to decide life or death, it's totally within his discretion what he does. And if you were given an opportunity to give favorable discretion on that [land]lady, I expect you might have. And just because of the favorable impression that you had had of her, at

least you learned from her in the courtroom. These people [referring to Juror No. 5 and other panelists] had those kinds of impressions about the victim or witnesses prior to coming in here to court. I don't think they should sit as jurors, each and every one of them should be excused for cause."

The court replied: "[M]y option with the [property owner] was just to disregard the law, say there has been substantial compliance, which is not legal, and there would have been no appeal. . . . I followed the law, that is what the jurors are saying they can do. I don't know what more we can ask."

Defense Counsel Sada said: "I don't think it's the same . . . somebody who gets information from a police officer is not significantly different than the . . . paramedic who responded to the scene, what he may or may not have seen, what he would bring into the mix because of having been there which would, we find, preclude him. He says here he can be fair. By allowing him to sit would be reversible error." He continued: "There is a lot of information that can be used to contemplate the jury potential regarding, number one, what was said about the officers regarding [defendant's] past, things he would know, individual knowledge, even if he didn't bring the bias in the courtroom, which would probably come out one way or the other. We think he should be removed for cause. . . . [¶] . . . There is a lot of things that put this into a position where it's not safe to leave this juror on as cause exists. We strongly urge the court and we are making a challenge for cause." The prosecutor responded that Juror No. 5 had said he could be "fair and impartial" and "was not equivocal."

Defense Counsel Beaudikofer pointed out that Juror No. 5 did say "he would have difficulty. I think under the circumstances where he has such contacts, danger of polluting

the jury and him carrying a bias are so apparent that the challenge for cause should be sustained." Defense Counsel Sada added, "We're not calling him a liar. . . . [W]hen his starting point is announced, a red flag goes up and everything else that is involved with this potential juror needs to be considered within that context. We're saying that within the context of employment, with the starting point, he is a cause."

The court stated: "I got to admit, I'm not sure if there is a case — defense has not pointed out a case, neither has the prosecution that indicates that these kind of cumulative facts add up to a challenge for cause. There may be such a case out there, but I'm sticking to [Code of Civil Procedure section] 229, which I suppose is the best thing to do unless there is a case that says otherwise. And it doesn't say anything about the state of affairs or facts that would cause a reasonable person to strongly suspect that the juror may not be fair. [¶] What it says is the existence, actual existence of a state of mind of the juror evincing enmity against or bias towards either party." The court continued: "Now, with regard to his statement he would find it difficult, I have to say, we are dealing with the frailties of the . . . . English language. When we say, 'Would you find it difficult?' Well, you know, I could see jurors saying, I would find it difficult, and if it is proven that Mr. Deen actually caused the death of these people, I would find it difficult to find him not guilty for obvious emotional reasons. I don't think that evinces an enmity against Mr. Deen or bias towards either party. *Other than that, there is nothing that appears to apply.* The challenge for cause will be denied as to [Juror No. 5]."

Shortly after Juror No. 5 was questioned, defendant requested additional peremptory challenges because of the "large number of law enforcement people" in the panel. The

defense did not initially make a change of venue motion. The court asked, "given the occupational makeup of" the panelists, "why is there any reason to believe that the jury is going to get any better?" when subsequent groups of panelists are questioned during voir dire.[5]

It added: "I'll be blunt here. It may be that the . . . appropriate remedy, assuming your objection is well-taken, is a change of venue to a place where not so many peace officers worked or where a large percentage of the jury pool are not connected to peace officers or correctional officers, law enforcement." Counsel replied that at "a minimum" the defense team was "excusing people that knew the victim," asserting "we don't have to go too far to find people that don't know the victim." The court replied: "You are going to have to go a long way to find a jury that didn't know [Chief] Leonard Speer. A long way."

Defense counsel replied: "I am talking about having coffee with him. Working with him professionally. Having business dealings with him." The prosecutor asked how many panelists had "indicated that," and counsel identified panelists Raymond C. and Daniel P., adding, "It's been more than that." The court noted it had reviewed the questionnaires for the next panel that would be called and anticipated that there would be the "same number of people" in law enforcement. It denied the request for additional peremptory challenges.

Defendant then requested "as a fall-back position" at least two additional challenges because he had peremptorily challenged two panelists who had "served professionally and

---

[5]     Although a third panel was sent to the courtroom at the end of voir dire, and some of these panelists completed questionnaires, the jury of 12 was sworn before excusals on the third panel began.

personally with the victim in this case." He also, for the first time, made an oral motion for a change of venue. The prosecutor exercised three more peremptory challenges, and the jury panel was set. Opening statements were scheduled to begin the following day.

Before swearing the jury, the court addressed defendant's request for two additional peremptory challenges and the change of venue motion. As to the request for additional challenges, the court noted, "With regard again to knowledge of the victims, I only have one who had any knowledge of the victims other than perhaps . . . reading somebody's name in the paper. That would be [Juror No. 5], who indicated that he had had some dealings with Mr. Speer, real estate, and also had knowledge of him as a police officer, but didn't indicate that he was a friend of his or anything." Counsel said, "He indicated that he went to coffee with him." The court said: "Okay. I could imagine that could happen if you are going to look at a house or something like that. He didn't indicate a strong affection. Again, he's the only one. So the court will deny the request for additional peremptory challenges based on the showing that has been made." Neither the court nor counsel mentioned Juror No. 5's admission that he had worked on Speer's election campaign or his statement: "and so we were — in that sense, a friendship existed."

The court then addressed defendant's oral change of venue motion. When discussing the publicity prong of the venue analysis, the court stated that "no jurors have indicated that they have heard anything about the case. [¶] . . . [¶] . . . [i]n excess of what we have told them here at trial." Defense counsel asserted that Juror No. 5, the "former property clerk [sic] for [the] El Centro Police

Department told us specifically that he heard it directly from officers involved in the investigation."[6] The court agreed.

Defense counsel said: "I go back to [Juror No. 5] again, not to belabor the point on him, in the case of [Juror No. 5], he heard facts, information on the date of the offense. It's unreasonable . . . for any of us to believe that whatever evidence comes in will not be supplemented[,] at least in his mind[,] by his recollection of what fellow law enforcement officers said" and he will "become an advocate based on information that wasn't admissible, maybe was not even correct." The court agreed to "conduct some additional inquiry of [Juror No. 5] regarding what it was that he heard." The prosecutor objected and requested the court instead review the transcript of Juror No. 5 from earlier that day. The court did so.

After its review the court said: "I'm still grasping for a possible answer that he could have given or possible information that he could have received that would yield a challenge for cause in spite of the fact that he has indicated that he could set all of that aside and base his decision on the evidence in the case." The court asked if a panelist says they heard certain information, but they could set that aside and base their " 'decision on the facts presented at the trial' " is that "a challenge for cause?"

Counsel responded that "[t]here doesn't have to be one factor that makes a person challengeable for cause," but "[t]here could be

---

[6]    In several instances counsel at trial and on appeal appear to misrecall or misconstrue the record of Juror No. 5's statements. The record taken as a whole indicates that Juror No. 5 had retired during the year before the killings and had never worked on the case.

a combination of circumstances . . . demeanor, . . . the answer to a number of different questions taken together which would cause a significant doubt as to [the] reliability of that person's verdict if they are on the jury.  I think that is what we're talking about with [Juror No. 5]."  The court said, "*I have been begging for . . .some sort of case authority on that.  The authority that I find when I look [at death penalty cases] says things like . . . 'the fact that a juror indicated that he . . . had certain feelings that the defendant was guilty of the crime does not . . .warrant a challenge for cause where the juror said they could be fair and impartial.' "  The court noted a case where the panelist had said they would favor peace officers' testimony, and the Supreme Court said on appeal that the "juror said they could be impartial, follow the law, *that's good enough.  I understand the defense's concern.  I think I might have the same concern myself.  It appears from the examination of the appellate cases in death penalty cases that for cause means [Code of Civil Procedure section] 229 and* Witherspoon*, and that sort of thing, but not reasonable suspicion or possibility . . . .  That is what I'm begging for authority on that.*"  Counsel responded that "I think that the court would agree [it has] discretion . . . if you get a feeling from the totality of the circumstances that this man appears . . . he would have difficulty being impartial."

The court stated that Juror No. 5 "said that he could be fair and impartial; that he could base his decision on the evidence here in court.  If at this point in the trial the court is going to say, well, that is a challenge for cause, and I don't think it is, I think I would just be imposing my will on the process if I were to do that because the appellate authority seems pretty clear that is not a challenge for cause.  [¶] . . .  I looked since we began this voir dire process, *where is the line on pass for cause or grant a challenge for cause?*  And it appears clear that where the juror says, 'I could be fair and

impartial and set aside . . . my feelings,' things they heard about the case, . . . unless the court disbelieves the statement, and I have no reason to disbelieve it, that is not a for-cause challenge. *I'm stuck with that, even though I might be uncomfortable if I were the defense.* That's the way that comes out. So the jury will remain as it is."

The court then denied the oral change of venue motion. It noted that there was no prejudicial pretrial publicity, and those panelists who had heard about the case had "indicated that they could set aside what they heard, whatever that may be, and decide the case based on the facts presented at trial. We have . . . one juror who is in the box, [Juror No. 5], who has some prior contact with Chief Speer in the context of looking at a house for real estate and that sort of thing, and general knowledge of him as a law enforcement officer. And I don't think that is sufficient for a change of venue motion." The jury was then sworn.

## B. Analysis

"The Sixth Amendment of the United States Constitution guarantees the right of a defendant in all criminal prosecutions to a trial by an 'impartial jury.' The California Constitution independently guarantees the right to trial by an impartial jury. (Cal. Const., art. I, § 16; see *People v. Thomas* (2011) 51 Cal.4th 449, 462 . . . .) 'The Sixth Amendment right to an impartial jury and the due process right to a fundamentally fair trial guarantee to criminal defendants a trial in which jurors set aside preconceptions, disregard extrajudicial influences, and decide guilt or innocence "based on the evidence presented in court." ' " (*People v. Mataele* (2022) 13 Cal.5th 372, 402–403 (*Mataele*).)

California's Code of Civil Procedure[7] contains a statutory framework designed to implement the jury trial right and describes the circumstances in which a potential juror can be excluded from service. Section 225[8] defines a juror challenge as "an objection made to the trial juror[] . . . and is [one] of the following classes and types." Section 225, subdivision (b)(1), permits a challenge for cause for: "(A) General disqualification," (see § 203, subd. (a) [identifying those generally disqualified]), "(B) Implied bias — as, when the existence of the facts as ascertained, in judgment of law disqualifies the juror," or "(C) Actual bias — the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party."

---

[7]     All undesignated statutory references are to the Code of Civil Procedure.

[8]     Section 225 provides inter alia:

"A challenge is an objection made to the trial jurors that may be taken by any party to the action, and is of the following classes and types:  [¶] . . . [¶]

"(b) A challenge to a prospective juror by either:

"(1) A challenge for cause, for one of the following reasons:

"(A) General disqualification — that the juror is disqualified from serving in the action on trial.

"(B) Implied bias — as, when the existence of the facts as ascertained, in judgment of law disqualifies the juror.

"(C) Actual bias — the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party.

"(2) A peremptory challenge to a prospective juror."

Section 225, subdivision (b)(2) permits peremptory challenges. In the context of a trial, bias can be understood generally as a tendency to favor or disfavor a person or group of people, or to lean in favor of or against a certain outcome.

Section 229 defines "implied bias" by setting out categories which, as a matter of law, render a prospective juror unqualified to serve. In establishing the criteria for "implied bias" the Legislature has concluded, as a matter of policy, that persons meeting them are categorically disqualified from jury service because the Legislature statutorily implies, or imputes, a bias to them. The Legislature has made those criteria specific and circumscribed, providing that a "challenge for implied bias may be taken for one or more of the [enumerated] causes, and for no other." (§ 229.) Under section 229, a challenge for implied bias lies only for the reasons listed in that provision. (*People v. Ledesma* (2006) 39 Cal.4th 641, 670.)

The section 229 categories of an implied bias objection include various kinds of relationships between the potential juror and a litigant, victim or witness (*id.*, subds. (a), (b)); service as trial or grand juror or as a witness in a previous trial between the same parties (*id.*, subd. (c)); an interest in the questions involved in the trial beyond that which any member of the community might have (*id.*, subd. (d)); having an "unqualified opinion or belief" as to the merits of the action founded upon knowledge of its material facts (*id.*, subd. (e)); or a state of mind evincing enmity against, or bias towards, either party (*id.*, subd.

(f)).[9] Implied bias is "bias conclusively presumed as [a] matter of law." (*United States v. Wood* (1936) 299 U.S. 123, 133.)

---

[9] Section 229 provides: "A challenge for implied bias may be taken for one or more of the following causes, and for no other:

"(a) Consanguinity or affinity within the fourth degree to any party, to an officer of a corporation which is a party, or to any alleged witness or victim in the case at bar.

"(b) Standing in the relation of, or being the parent, spouse, or child of one who stands in the relation of, guardian and ward, conservator and conservatee, master and servant, employer and clerk, landlord and tenant, principal and agent, or debtor and creditor, to either party or to an officer of a corporation which is a party, or being a member of the family of either party; or a partner in business with either party; or surety on any bond or obligation for either party, or being the holder of bonds or shares of capital stock of a corporation which is a party; or having stood within one year previous to the filing of the complaint in the action in the relation of attorney and client with either party or with the attorney for either party. A depositor of a bank or a holder of a savings account in a savings and loan association shall not be deemed a creditor of that bank or savings and loan association for the purpose of this paragraph solely by reason of his or her being a depositor or account holder.

"(c) Having served as a trial or grand juror or on a jury of inquest in a civil or criminal action or been a witness on a previous or pending trial between the same parties, or involving the same specific offense or cause of action; or having served as a trial or grand juror or on a jury within one year previously in any criminal or civil action or proceeding in which either party was the plaintiff or defendant or in a criminal action where either party was the defendant.

"(d) Interest on the part of the juror in the event of the action, or in the main question involved in the action, except his or her interest as a member or citizen or taxpayer of a county, city and county, incorporated city or town, or other political subdivision of a county, or municipal water district.

"Actual bias," on the other hand, is neither presumed nor categorical. It is based upon a particularized assessment of the state of mind of the individual panelist in the context of a given case. Here the trial judge did not find Juror No. 5 had, in the words of the statute, an "unqualified opinion or belief as to the merits of the action" or a state of mind reflecting "enmity against, or bias towards, either party" to the litigation. (§ 229, subds. (e), (f).) However, the court did not adequately examine whether he may have harbored actual bias under section 225.[10] A review of the statutory language demonstrates that sections 225 and 229 are complementary provisions that should be considered together. Section 225 provides that a challenge may be granted for either actual (*id.*, subd. (b)(1)(C)) or implied bias (*id.*, subd. (b)(1)(B)). Section 229 explicates when bias is

"(e) Having an unqualified opinion or belief as to the merits of the action founded upon knowledge of its material facts or of some of them.

"(f) The existence of a state of mind in the juror evincing enmity against, or bias towards, either party.

"(g) That the juror is party to an action pending in the court for which he or she is drawn and which action is set for trial before the panel of which the juror is a member.

"(h) If the offense charged is punishable with death, the entertaining of such conscientious opinions as would preclude the juror finding the defendant guilty; in which case the juror may neither be permitted nor compelled to serve."

[10] Section 227 provides: "The challenges of either party for cause . . . may be taken separately, in the following order . . . :

"(a) To the panel.

"(b) To an individual juror, for a general disqualification.

"(c) To an individual juror, for an implied bias.

"(d) To an individual juror, for an actual bias."

"implied" or imputed, as a matter of law, but it does not undermine or supplant an actual bias inquiry under section 225.

Many of the categories listed in section 229 are based on some readily identifiable data point: the panelist is either closely related to a party or not; he has sued a party before or he hasn't; he sat on a related jury or he didn't. When one of those delineated facts is ascertained there is a nonrebuttable presumption of bias and the panelist is categorically deemed unqualified to serve. But there is some overlap between the two statutes, which is most discernible in section 229, subdivision (f) (hereafter section 229(f)). That subdivision requires an inquiry into the panelist's state of mind, just as section 225 does.

However, simply because a panelist is not presumptively disqualified as impliedly biased under section 229's explicit categories does not mean his or her state of mind would enable them to serve with "entire impartiality" (§ 225(b)(1)(C)) or without "enmity against, or bias towards, either party" (§ 229(f)). Section 225 and section 229(f) expand the inquiry to ensure that panelists harboring actual or implied bias do not sit. In this regard there is no practical difference between the trial court's fact-finding job under sections 225 and 229(f). Both require something more than resolving a question of historical fact. Instead, they call for consideration of a panelist's state of mind and a reasoned judgment concerning the panelist's ability to evaluate the evidence fairly and impartially.

This understanding of the interaction between the statutes is consistent with the holding of *People v. Ledesma*, *supra*, 39 Cal.4th at page 670: "Under California law, a juror may be excused for 'implied bias' only for one of the reasons listed in Code of Civil Procedure section 229, 'and for no other.' (Code Civ. Proc., § 229.) If the facts do not establish one of the

grounds for implied bias listed in that statute, the juror may be excused for '[a]ctual bias' if the court finds that the juror's state of mind would prevent him or her from being impartial."

Thus, even when a panelist does not overtly express bias or otherwise manifest statutorily defined implied bias, they may be properly excused for cause based on the court's finding of actual bias under section 225. A consideration of either actual bias or "implied bias" under section 229(f) requires a factual finding that includes "determinations of demeanor and credibility that are peculiarly within a trial judge's province." (*Wainwright v. Witt* (1985) 469 U.S. 412, 428 (*Witt*); see *People v. Alvarez* (1996) 14 Cal.4th 155, 196–197.) "Except where bias is clearly apparent from the record, the trial judge is in the best position to assess the state of mind of a juror or potential juror on voir dire examination." (*People v. McPeters* (1992) 2 Cal.4th 1148, 1175.)

As we observed in reviewing the ruling on a for-cause challenge in another death penalty case: "When a prospective juror is excused following voir dire, . . . whether that juror 'is substantially impaired is an issue for the trial court's determination.' [Citation.] We defer to the trial court's decision so long as the trial court applied the correct legal standard and reached a decision supported by substantial evidence." (*People v. Baker* (2021) 10 Cal.5th 1044, 1085–1086 (*Baker*), and cases cited.) By analogy, in *Witt*, *supra*, 469 U.S. at page 424, the high court articulated a standard for determining when a capital panelist may be excused for cause consistent with the Sixth Amendment. In that context the court explained, an excusal may be granted when the panelist's "views would 'prevent or substantially impair the performance' " of his or her " 'duties as a juror in accordance with' " the instructions and the

juror's oath. *Witt* observed that a panelist's "bias" need not be "proved with 'unmistakable clarity.' " (*Ibid*.) "Despite . . . lack of clarity in the printed record, . . . there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." (*Id*. at pp. 425–426.) This explanation captures the distinction between the categorical factors in much of section 229 when there is no "lack of clarity in the printed record," and the broader inquiry that is required under sections 229(f) and 225. Reading the statutes together assures that the right to a fair and impartial jury is protected. It is the trial court's obligation to ensure that those chosen to sit on a jury are qualified to do so.

The court here concluded it lacked the authority to grant the challenge, despite its misgivings, because the juror said he could be fair and follow his oath and the court determined the juror was sincere when he said so. We evaluate the court's decision based on the record at the time the decision was made. This record reflects the following.

Juror No. 5 was forthcoming and open as to his associations with Chief Speer, the fact that he had heard details from law enforcement on the day of the killings and thereafter, and that he followed the case in the press. He wrote in his questionnaire that he would have difficulty keeping an open mind and that the accusation of killing a police officer would prevent him from being fair and impartial. He explained that he had known Chief Speer for a number of years, had business dealings with him, knew his wife, would have coffee with him from time to time, and campaigned for him when he ran for sheriff. He added: "in that sense, a friendship existed." He was on his way to attend Speer's funeral but was called away as he

was approaching the service. He knew 14 of the potential witnesses. When asked if his experience as a police employee would make it difficult for him to be fair and impartial, he replied: "I would like to think not, but of course being in law enforcement, entrenched in it for 15 years might be a little difficult." Nevertheless, Juror No. 5 said he could be a fair and impartial juror in a case where someone was accused of murdering Chief Speer, could set aside what he had heard from law enforcement sources, could fairly evaluate the testimony of people he knew, and could "wait until the end of the case . . . until both sides had presented their case and argued the case" before making up his mind.

The court concluded that Juror No. 5 was being honest when he made that self-assessment. And yet, the trial court recognized the difficulty. It characterized its own thinking as "grasping" for a possible answer Juror No. 5 could have given that would support a challenge, even though he said he could be fair and impartial. It twice described itself as "begging" for case authority that would permit it to grant the challenge. It stated that section 229 "doesn't say anything about the state of affairs or facts that would cause a reasonable person to strongly suspect that the juror may not be fair. [¶] What it says is the existence, actual existence of a state of mind of the juror evincing enmity against or bias toward either party . . . . Other than that, there is nothing that appears to apply." By concluding the challenge for cause could only be granted if it found one of the circumstances delineated in section 229, the trial court failed to consider the full scope of its authority, and to read section 229(f) in conjunction with section 225.

It turned to case authority for guidance, asking: "[W]here is the line on pass for cause or grant a challenge?" In the end it

concluded that when a panelist says they can be fair and can set aside their feelings and what they have heard, "That is good enough," and "I'm stuck with that." The court understood its role and its responsibility too narrowly.

In the face of a challenge for cause the court is called upon to independently consider whether a prospective juror can and will be fair to both sides, judge the case based solely on the evidence presented, and follow the law as instructed by the court. Making that assessment can be challenging. It requires the court to determine the panelist's existing state of mind and discern how that panelist will discharge their role if called upon to do so. As with other bias determinations, in making its ruling the court must objectively consider the totality of the circumstances before it. As we explained in *In re Manriquez* (2018) 5 Cal.5th 785, 799, " '[W]hat constitutes "actual bias" of a juror varies according to the circumstances of the case.' " These factors include the person's statements, along with any expression of concern or hesitancy; the panelist's knowledge of and relationship to the victim or the defendant; and their own assessment of their willingness and ability to discharge their responsibility as the law requires. A panelist's self-assessment is surely relevant. But even when a panelist says they want to be fair, and believes they can be, the ultimate question remains with the court. (See *People v. Ramirez* (2022) 13 Cal.5th 997, 1041; *People v. Lewis* (2008) 43 Cal.4th 415, 450.) Of course, even the wisest of trial judges cannot predict the future with certainty. Resolution of the question may often turn on case specific matters of degree: just how much information the panelist has been exposed to; the source of the information; the closeness of relevant relationships; the intensity of their views

on matters at issue; and the source of those views. All are relevant, and none is necessarily dispositive.

Yet the court must be also attuned to the practical constraints of human nature and empanel a jury whose members can reasonably be expected to act in accordance with their oath. A given panelist may very well want to be fair and follow the law. They may truly aspire to do so. They may also hesitate to say otherwise. As we have observed, all these concerns are amplified in a death penalty case where the prospective juror might be called upon to decide between the death penalty and life imprisonment. (See generally, *People v. Tidwell* (1970) 3 Cal.3d 62, 73, 75 [dealing with a change of venue motion and discussing the particular challenges of seating jurors who were familiar with homicide victims].) At the end of the day the "line" this trial judge cast about for is an objective determination to be made by the court based on the totality of circumstances. The judge's conclusion will be upheld on appeal if it is reached by applying the proper standard and is supported by substantial evidence. (*Baker*, *supra*, 10 Cal.5th at pp. 1085–1086.)

Here the trial court's narrow application of section 229 failed to consider other pertinent authority, including section 225, subdivision (b)(1)(C)'s definition of actual bias. Evaluating whether that state of mind exists is informed by the high court's similar approach in the Sixth Amendment context. We have observed that the *Witt* "standard is consistent with the state Constitution's impartial jury guarantee." (*Mataele*, *supra*, 13 Cal.5th at p. 405 [referencing Cal. Const., art. I, § 16]; *People v. Mattson* (1990) 50 Cal.3d 826, 844.)

As with cases decided under *Witt*, a court may form a "definite impression that a prospective juror would be unable to

faithfully and impartially apply the law." (*Witt, supra*, 469 U.S. at pp. 424, 426.) In doing so, "[t]he trial court is entitled to consider the entirety of a prospective juror's examination in deciding whether a[n] . . . excusal is justified." (*People v. Tate* (2010) 49 Cal.4th 635, 675, fn. 22.) While *Witt* deals particularly with attitudes on the death penalty, its characterization sheds light on how a trial court should consider whether a panelist's "state of mind . . . will prevent the juror from acting with entire impartiality." (§ 225, subd. (b)(1)(C).)

A ruling on a challenge for cause should proceed as follows. If, taking into account the panelist's statements and demeanor, the trial judge finds that circumstances such as the panelist's relationship with the parties or potential witnesses, or any other factors bearing on potential bias, would prevent or substantially interfere with the panelist's ability to follow their oath and base their decision solely on the evidence, follow the law as instructed, and decide the case with "entire impartiality, and without prejudice to the substantial rights of any party" (§ 225, subd. (b)(1)(C)), the challenge should be granted.

Conversely, if the panelist says they can and will be fair, the court accepts that assessment as honestly held, *and* the court objectively finds the panelist can act impartially as the law requires, the challenge should be denied. Here the trial court could not discern the standard, "the line," between granting or rejecting the challenge. Instead, it considered itself "stuck" with the juror's self-assessment, even though the court itself harbored substantial misgivings. It misunderstood existing precedent to rigidly hold that if a "juror said they could be impartial, follow the law, *that's good enough*." As a result, the court did not make the findings required of it. We review that ruling at the time it was made. Ordinarily, we review a trial

court's factual findings with deference. Here, however, the court failed to properly understand the scope of its authority to objectively determine the panelist's qualification to serve and hence did not apply the proper standard in making that evaluation. As the court explained in *Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 393: " 'Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion.' " In addition, in reviewing a ruling on a for-cause challenge, we review the factual findings upon which the ruling is based for the presence of substantial evidence supporting it. (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 245.)

The distinction between reversing for failure to apply the correct legal standard and holding that a ruling is unsupported by substantial evidence can be a fine one. Here we are not concluding the court *misused* its judgment, instead the record reflects the court failed to *exercise* its judgment as the law requires. Had the trial court made a finding, informed by its own observations and objective evaluation, and made a record of the factors on which it relied, we could then examine the record to see if the determination was supported by substantial evidence. Here however, the court did not. As a result, we cannot. In this case, a juror who had not been properly evaluated as the law requires sat on defendant's case.[11] Under

---

[11] We hasten to add that we are not concluding that Juror No. 5 acted improperly in any way or failed to follow his oath. We hold instead that, at the time the court's decision was made, it failed to exercise its judgment as the law requires and to provide a record permitting proper appellate review.

the circumstances reflected in this record the judgment in its entirety must be reversed.

In summary, we include the following observations for guidance going forward. In applying sections 225 and 229(f) the court applies an objective standard, taking into account the totality of circumstances. When a panelist has been personally acquainted with a party, victim, or witness, or has received detailed information about the case from prospective witnesses, those circumstances are particularly significant and merit close consideration. While any such fact, standing alone, may not categorically dictate an excusal for cause, the discussion in *Tidwell* highlights the difficulty in achieving an "impartial adjudication" in such an instance. Over 100 years ago the Court of Appeal in *People v. Ruef* (1910) 14 Cal.App. 576, 594 aptly observed: "If the trial judge is, from the examination of the juror, or other evidence, doubtful as to whether or not the juror can and will discard his opinion, and fairly and impartially try the case, he should resolve such doubt against the juror and excuse him. This is the safe rule; and if followed would save much trouble and grave questions before the courts of appeal."

We also note that, in picking a fair and impartial jury, there are other important aims to be achieved as well. The object is to employ a balanced and consistent assessment. The standard for granting an excusal for cause should be set neither too low nor too high. The guiding principle is whether the challenged panelist can give both sides a fair trial as the law requires. Jury selection is also designed to achieve a panel that represents the community, including those with differing perspectives and life experiences. A diversity of approaches and experiences among jurors helps assure that the case will be given a close and thorough evaluation.

Before finding that a panelist is actually biased under section 225, the court must form a "definite impression" that the prospective juror would be "unable to faithfully and impartially apply the law." (*Witt, supra,* 469 U.S. at pp. 424, 426.) Likewise on appeal the reviewing court must conclude that the trial judge's factual finding as to the panelist's impairment is supported by substantial evidence. In this regard the trial court must ensure that the record is sufficient to facilitate appropriate appellate review. It must conduct, or allow counsel to conduct, an adequate voir dire to clarify the pertinent circumstances bearing on the panelist's state of mind. When such a record is lacking, whether because sufficient inquiry was not made, or was inhibited by arbitrary time limits or other constraints, both the court and the advocates may resort to preconceived notions or unsupported deductions, rather than evaluating the panelist as an individual and in light of the particular circumstances. (See § 223, subd. (b)(1), & (2), added by Stats. 2017, ch. 302, § 2, eff. Jan. 1, 2018.)

## III. DISPOSITION

The judgment is reversed in its entirety and the matter remanded to the superior court for trial de novo.[12]

**CORRIGAN, Acting C. J.**

**We Concur:**

**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**EVANS, J.**
**WEINGART, J.***
**RUBIN, J.****

---

[12]    In the trial court, the competency phase was given a different case number than the case number assigned to the guilt, sanity, and penalty phases.  We have added the competency case number to our automatic appeal docket here for the remaining phases.  The competency phase is part of the case on appeal and encompassed by our disposition.  (See *People v. Mickle* (1991) 54 Cal.3d 140, 155–156, 180–181.)

---

*    Associate Justice of the Court of Appeal, Second Appellate District, Division One, assigned pursuant to article VI, section 6 of the California Constitution.

**    Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. DEEN

S092615

Concurring Opinion by Justice Groban

I concur in the majority's opinion in full. I write to observe that this case follows a familiar pattern: Like so many of our death penalty appeals, the record contains significant evidence that defendant Omar Richard Deen, starting at a young age, suffered from severe mental illness.[1] Multiple defense experts

---

[1]    (See, e.g., *People v. Helzer* (2024) 15 Cal.5th 622, 638 [psychologist "diagnosed defendant with schizoaffective disorder, bipolar type," meaning "defendant exhibited schizophrenic features, such as hallucinations and delusions"]; *People v. Johnson* (2022) 12 Cal.5th 544, 564 [a psychologist "concluded defendant suffered from paranoid schizophrenia" and "noted that defendant had suffered several paranoid delusions over the previous 20 years"]; *People v. Steskal* (2021) 11 Cal.5th 332, 342 ["The defense psychiatrist . . . concluded that Steskal suffered from chronic paranoia that had progressed to full-blown psychosis"]; *People v. Miles* (2020) 9 Cal.5th 513, 530 [mental health professionals opined that "defendant suffered from schizophrenia" and "schizo-affective disorder"]; *People v. Johnson* (2019) 8 Cal.5th 475, 489–491 [defendant diagnosed with paranoid schizophrenia]; *People v. Potts* (2019) 6 Cal.5th 1012, 1025 [defendant diagnosed by psychiatrist several months before the killing with chronic " 'paranoid schizophrenia' "]; *People v. Powell* (2018) 5 Cal.5th 921, 937 [defendant had been diagnosed repeatedly with "depression, bipolar disorder, and schizophrenia"]; *People v. Ghobrial* (2018) 5 Cal.5th 250, 262–263 ["Defendant exhibited a number of psychotic behaviors and regularly suffered from hallucinations"]; *People v Mendoza* (2016) 62 Cal.4th 856, 866

1

testified at trial that defendant suffered from childhood-onset paranoid schizophrenia with psychotic delusions and was a "severely impaired individual with . . . very serious psychoses." Prior to the crimes at issue, defendant was hospitalized and experienced auditory and visual hallucinations. This case raises the difficult question of whether capital punishment is appropriate for individuals with severe mental illness.

The Eighth Amendment's prohibition on cruel and unusual punishment precludes capital punishment for individuals with intellectual disabilities because these individuals "have diminished capacities to understand and process information." (*Atkins v. Virginia* (2002) 536 U.S. 304, 318 (*Atkins*); see also *id.* at p. 317 [those with intellectual disabilities possess "characteristics . . . [that] undermine the

_____

(*Mendoza*) [psychiatrist testified that defendant was suffering from "major depressive disorder with psychotic features"]; *People v. Cage* (2015) 62 Cal.4th 256, 271 [the defendant's brain "scan was consistent with his having suffered a brain injury and with a diagnosis of schizophrenia"]; *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1165 [psychologist concluded that one defendant suffered "from a cyclothymic disorder and a borderline personality disorder"]; *People v. DeHoyos* (2013) 57 Cal.4th 79, 96 [defendant diagnosed with "chronic schizophrenia of the paranoid type"]; *People v. Blacksher* (2011) 52 Cal.4th 769, 784–785 [defendant diagnosed as a paranoid schizophrenic who suffered from delusions]; *People v. Weaver* (2001) 26 Cal.4th 876, 941 [psychologists testified that defendant suffered from schizophrenia]; *People v. Medina* (1995) 11 Cal.4th 694, 724 [psychologist "testified that defendant suffered from a psychotic disorder, probably schizophrenia"]; *People v. Kelly* (1992) 1 Cal.4th 495, 516 [evidence presented that defendant had a " 'schizotypal personality disorder in conjunction with a moderate degree of brain damage' "].)

strength of the procedural protections that our capital jurisprudence steadfastly guards"]; cf. *Mendoza, supra,* 62 Cal.4th at p. 911 [under the California Constitution's prohibition on cruel and unusual punishment (art. I, § 17), a court must examine the " 'mental capabilities' " of the defendant and if the punishment " ' " ' "offends fundamental notions of human dignity" ' " [citation], the court must invalidate the sentence' "].)  For similar reasons, juveniles are also constitutionally exempted from "the most severe punishment" because the juvenile's "blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity" and the death penalty has no clear "deterrent effect." (*Roper v. Simmons* (2004) 543 U.S. 551, 568, 571 (*Roper*).)  This court and/or the Legislature will eventually need to determine whether the same reasoning applies to the execution of individuals suffering from severe mental illness.  (Cf. *Mendoza, supra*, 62 Cal.4th at p. 909 [" 'it may be that mentally ill offenders who are utterly unable to control their behavior lack the extreme culpability associated with capital punishment' "].)[2]

---

[2]     (See also Note, *Evolving Standard of Decency*: *How Ohio House Bill 136 Makes a Compelling Case for a Nationwide Prohibition on Execution of Criminal Offenders Who Suffered from Severe Mental Illness at the Time of Their Crime* (2023) 54 U.Tol. L.Rev. 493, 508 [the diminished capacity of those who suffer from serious mental illness "is sufficient to suggest that the main justifications for the death penalty — deterrence and retribution — are not served by executing the mentally ill"]; Note, *Cruel and Unusual: The Constitutional Requirement for Heightened Protections for Defendants with Severe Mental Illness in Capital Cases* (2021) 57 Idaho L.Rev. 299, 304–306 [concluding that there appears to be a national consensus that the death penalty should not be imposed on individuals with

The American Bar Association's Death Penalty Due Process Review Project concluded that individuals with severe mental illness should not be subject to execution because capital punishment is unlikely to serve any meaningful deterrent or retributive purposes for such cognitively impaired individuals. (Death Penalty Due Process Review Project, American Bar Association, Severe Mental Illness and the Death Penalty (Dec. 2016) pp. 1, 38 <https://www.prisonpolicy.org/scans/aba/ SevereMentalIllnessandtheDeathPenalty_WhitePaper.pdf> [as of Apr.6, 2026]; all Internet citations in this opinion are archived by year, docket number, and case name at <https://courts.ca.gov/ opinions/cited-supreme-court-opinions>.) According to the American Bar Association, "current mechanisms in the criminal justice process," i.e., competency to stand trial, the insanity defense, mitigating factors at the penalty phase of a capital trial, and competency to be executed, "do not adequately protect defendants with severe mental illness against death sentences and executions." (*Id.* at p. 38; see generally *id.* at pp. 19–25.) In its view, the continued sanctioning of the death penalty for individuals with severe mental illness is misaligned with both professional and public consensus and immediate reforms are necessary. (See *id.* at pp. 34–38.)

Consistent with that conclusion, some states have enacted laws that allow individuals charged with aggravated murder,

---

severe mental illness]; Note, *Addressing Defendants Who Are "Crazy, But Not Crazy Enough": How* Hall v. Florida *Changes the Death Penalty for Mentally Ill Defendants* (2016) 47 U.Tol. L.Rev. 743, 745–746 [evolving standards of decency should lead the high court to treat mentally ill offenders the same as individuals with intellectual disabilities and likewise exclude them from death penalty eligibility].)

who do not meet "the standard to be found not guilty by reason of insanity . . . or the standard to be found incompetent to stand trial," to nevertheless establish ineligibility for the death penalty. (Ohio Rev. Code Ann., § 2929.025(A)(1)(b); see also Ky. Rev. Stat. Ann., §§ 532.130(3), 532.135 & 532.140.) Much like juveniles and intellectually disabled individuals with "diminished capacities" (*Atkins*, *supra*, 536 U.S. at p. 318), these laws make ineligible for the death penalty those persons with serious mental illness that significantly impaired the person's capacity to exercise rational judgment. At current, a person with severe mental illness is eligible for execution in California as long as they understand their punishment and the reason for it. (See Pen. Code, § 3701.) But, as *Roper* and *Atkins* remind us, a person may be competent to stand trial, sane at the time of the offense, and competent to be sentenced to decades in prison, yet fundamental notions of human decency may nonetheless prohibit their eligibility for execution. As the high court and our court have repeatedly reminded, " 'death is different.' " (*Harmelin v. Michigan* (1991) 501 U.S. 957, 994; accord *People v. Zimmerman* (1984) 36 Cal.3d 154, 158.) Since defendant's death sentence was vacated by our opinion on other grounds, we do not need to decide this issue here. But the time will come when we need to determine whether executing someone who is psychotic or schizophrenic or hears voices offends " 'the evolving standards of decency that mark the progress of a maturing society.' " (*Roper*, *supra*, 543 U.S. at p. 561.)

**GROBAN, J.**

**We Concur:**

**LIU, J.**
**EVANS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Deen

_____

**Procedural Posture** (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**


_____

**Opinion No.** S092615
**Date Filed:** April 6, 2026

_____

**Court:**  Superior
**County:**  Imperial
**Judge:**  Jeffrey Bruce Jones

_____

**Counsel:**

Michael J. Hersek, Mary K. McComb and Galit Lipa, State Public Defenders, Harry Gruber, Ryan R. Davis and AJ Kutchins, Deputy State Public Defenders, for Defendant and Appellant.

Kamala D. Harris, Xavier Becerra and Rob Bonta, Attorneys General, Dane R. Gillette and Lance E. Winters, Chief Assistant Attorneys General, Julie L. Garland, Ronald S. Matthias and James William Bilderback II, Assistant Attorneys General, Robin Urbanski, Holly D. Wilkens, Charles C. Ragland, Kristine A. Gutierrez and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

AJ Kutchins
Deputy State Public Defender
1111 Broadway, Suite 1000
Oakland, CA 94618
(510) 267-3300

Daniel J. Hilton
Deputy Attorney General
600 West Broadway, Suite 1800
San Diego, CA 92101
(619) 738-9073